# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 18-1463V
### Filed: September 29, 2021
PUBLISHED

|  |  |
|---|---|
| LISA NEUSS-GUILLEN, | Special Master Horner |
| Petitioner, | |
| v. | Finding of Fact; Reactive |
| | Polyarthritis; Diagnosis; Onset; |
| SECRETARY OF HEALTH AND | Treating Physician Statement |
| HUMAN SERVICES, | |
| Respondent. | |

*Andrew Donald Downing, Van Cott & Talamante, PLLC, Phoenix, AZ, for petitioner.*
*Ronalda Elnetta Kosh, U.S. Department of Justice, Washington, DC, for respondent.*

## FINDING OF FACT[1]

On September 24, 2018, petitioner, Lisa Neuss-Guillen, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §300aa-10-34 (2012)[2], alleging that she suffered reactive polyarthritis ("RA") following the receipt of a tetanus/diphtheria/acellular pertussis ("Tdap") vaccination in her left deltoid at Beaver Medical Group on October 22, 2015. (ECF No. 1, p. 4; *see also* Ex. 2, p. 2.) On September 30, 2020, petitioner moved for a finding of fact that she was diagnosed with reactive polyarthritis following her vaccination, and that onset of her condition occurred "a few weeks" after vaccination. (ECF No. 37.)

For the reasons discussed below, although I find that petitioner contemporaneously reported a subjective complaint of increased joint pain in her upper extremities sometime between mid-November 2015 and February 3, 2016, the

---

[1] Because this finding contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the finding will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Hereinafter all "§" citations within this decision are to portions of the Vaccine Act at 42 U.S.C. §300aa-10-34.

remainder of her alleged symptoms are not preponderantly established as occurring within this period. On the current record, I am unable to conclude whether petitioner's post-vaccination symptom of increased upper extremity joint pain can be diagnosed as reactive polyarthritis. Accordingly, petitioner's motion is GRANTED in part and DENIED in part.

## I.    Procedural History

This case was initially assigned to Special Master Roth who ordered petitioner to file complete medical records and a statement of completion. (ECF No. 4.) Petitioner filed her medical records on October 29 and October 30, 2018, and a statement of completion on November 6, 2018. (ECF Nos. 6-8.) However, respondent filed a status report on February 12, 2019, explaining that petitioner's Exhibit 4 consisted of 40,938 pages of "disorganized and confusing" medical records from USC's Keck Medicine, and identifying some additional records needed to complete his review. (ECF No. 9.)

Special Master Roth issued a scheduling order on March 4, 2019 directing petitioner to file a motion to strike Exhibit 4 and refile the records from Keck Medicine organized by date and with PDF bookmarks. (ECF No. 10.) Petitioner filed additional medical records on March 18, 2019. (ECF No. 11.) On April 8, 2019, Special Master Roth held a status conference to discuss how petitioner should proceed in order to address the issues raised regarding Exhibit 4. (ECF No. 12.) Special Master Roth concluded that the most effective way to proceed would be for petitioner to abandon her motion to strike, and instead, file an additional exhibit with the same records, categorized by type of record. (*Id.*) Petitioner filed additional records on April 15, 2019, and the reorganized records on July 3, 2019. (ECF Nos. 13, 18.)

On August 26, 2019, this case was reassigned to my docket. (ECF No. 20.) I held a status conference on September 4, 2019 to discuss the next steps in the case. (ECF No. 22.) During the status conference, respondent explained that there appeared to be very little in the record, specifically in Exhibit 4, supporting petitioner's claim of a vaccine injury. Petitioner responded that she intended to file an amended petition with citations to the records supporting her allegations. She also expressed her willingness to file a statement from her treating rheumatologist, Dr. Ehresmann, in order to resolve the parties' concerns regarding the records from Keck Medicine. (*Id.* at 1.) Petitioner filed an amended petition on October 4, 2019, and a letter from Dr. Ehresmann on July 16, 2020. (ECF Nos. 23, 34; Ex. 8.)

On July 30, 2020, I held a status conference to follow up with the parties in regard to Dr. Ehresmann's letter at Exhibit 8. (ECF No. 35.) Respondent noted that several statements made by Dr. Ehresmann were not corroborated by any of petitioner's medical records. Petitioner's counsel agreed, but explained that Dr. Ehresmann's letter was based on observations he made during petitioner's IVIG infusions. Respondent requested that petitioner provide citations to any records that support the contentions made in Dr. Ehresmann's letter. Due to the difficulty in assessing the weight to be given to Dr. Ehresmann's letter, and because this letter is

the primary evidence supporting petitioner's alleged diagnosis, I recommended that the case proceed to a finding of fact in order to clarify the questions of diagnosis and onset. The parties agreed.  (*Id.*)

Subsequently the parties raised a concern by e-mail to chambers that the process of converting Exhibit 4 to optical character recognition ("OCR") may have removed images from the medical records.  Accordingly, on September 21, 2020, petitioner re-filed the Keck medical records previously submitted as Exhibit 4 without OCR capability as Exhibit 9.  (This decision references Exhibit 9 in preference to Exhibit 4.)

Petitioner filed a motion for a fact finding on the existing record on September 30, 2020.  (ECF No. 37.)  Respondent filed his response on March 1, 2021, and petitioner filed her reply on April 12, 2021.  (ECF Nos. 40, 41.)  Petitioner's motion is now ripe for resolution.

## II.    Factual History

### a.  As reflected in petitioner's medical records

Prior to her vaccination, petitioner had a fifteen-year history of Bechet's disease.[3] (Ex. 3, pp. 4-7; Ex. 9, pp. 1668-69, 13789-92.)  Her medical history also included joint pain (suspected to be inflammatory), obesity, gastric bypass surgery, osteoarthritis, a methicillin-resistant Staphylococcus aureus (MRSA) infection, pelvic pain, goiter, and ganglion.  (Ex. 9, pp. 13789-92, 15113-15, 21747, 21749-52, 21752-55, 24111, 24546-47, 24555-56.)  Petitioner's joint pain was affecting her ability to ambulate as early as 2008. (*Id*. at 1669.)  Petitioner's records specifically note that she experienced chronic pain with neuropathic and mechanical features, and complained of joint, hip, ankle, and back pain that limited her ability to walk.  (Ex. 9, pp. 1668-69, 13789-92, 24546-47.)  To manage her symptoms, petitioner was undergoing monthly IVIG infusions, and prescribed methadone, Vicodin, oxycodone, morphine, Norco, and Percocet.  (Ex. 9, 1668, 13789-92, 15113, 24548-50.)

With regard to her pre-vaccination Bechet's disease, petitioner contends that "her treatment protocol was controlling it." (ECF No. 37, p. 3.)  Petitioner stresses in particular a July 24, 2013 appointment in which a review of systems included no notation of joint, muscle, or neuropathic pain. (*Id*. at 2 (citing Ex. 9, p. 13761).)  Importantly, however, this particular encounter was for treatment of a separate complaint, namely chest pain and shortness of breath.[4] (Ex. 9, pp. 13761-62.)

---

[3] Bechet's disease or syndrome is "a variant of neutrophilic dermatosis of unknown etiology, involving the small blood vessels, characterized by recurrent aphthous ulceration of oral and pharyngeal mucous membranes and genitalia, with skin lesions, severe uveitis, retinal vasculitis, optic atrophy, and often involvement of the joints, gastrointestinal system, and central nervous system." *Dorland's Illustrated Medical Dictionary*, 33rd Ed. (2020), p. 1792.

[4] Accordingly, the fact that these specific complaints were not recorded in the review of systems may not be meaningful.  *See Kirby v. Sec'y of Health & Human Servs*., 997 F.3d 1378, 1383 (Fed. Cir. 2021)

Additionally, the fact of petitioner's Bechet's disease and her active course of pain management are discussed in the history of present illness.  Other of petitioner's pre-vaccination medical records discuss petitioner as suffering "chronic pain" (Ex. 3, p. 13 (March 6, 2015 encounter noting petitioner "has chronic pain").)  Although petitioner's treatment may have been effective, petitioner's medical records do not on the whole indicate that she was asymptomatic prior to the vaccination at issue.  For example, a March 25, 2014 record indicates that petitioner's Bechet's disease was "reasonably controlled" by her current treatment protocol while also observing her to still be symptomatic.  (Ex. 9, pp. 21749-52.)

Petitioner reported to Beaumont Urgent Care Center for a finger laceration on October 22, 2015.  (Ex. 3, pp. 4-7.)  She received several stitches and a Tdap vaccination.  (Id.)  The next document available in the medical record following petitioner's vaccination is a letter to Gallant Medical Supply from Dr. Ehresmann dated February 3, 2016.  The purpose of the letter was to support petitioner's request for a motorized scooter or wheelchair.  The letter describes petitioner's condition as:

> Bechet's syndrome, which results in systemic illness with joint pain diffusely in addition to . . . significant osteoarthritis of the lower extremities, particularly the left knee . . . and in the right lower extremity she has a ganglion cyst which is causing severe pain with weightbearing on that extremity . . . Additionally, she has upper extremity symptoms with epicondylitis and joint pain, much of which exacerbated following a tetanus immunization a few months ago which resulted in a reactive polyarthritis.

(Ex. 9, pp. 27199-201.)  Dr. Ehresmann also discussed increasing hip pain attributable to a traumatic fall occurring two years prior.  (Id.)

On March 7, 2016, petitioner received a bilateral hip x-ray.  (Ex. 9, p. 26262.)  The x-ray revealed mild degenerative changes of the bilateral hips, pubic symphysis, and visualized lumbosacral spine.  There was mild generalized osteopenia, but no acute fracture.  (Id.)  Petitioner also reported a headache, leg pain when walking, joint stiffness, tingling, generalized muscle aches and pains, and lower back pain.  (Id. at 26699.)  She did not report any shoulder or neck pain.

On April 12, 2016, Dr. Ehresmann referred petitioner to cardiologist Dr. Ray Matthews after an abnormal ECG.  (Ex. 9, pp. 27197-98.)  In his referral letter, Dr. Ehresmann wrote that petitioner was a:

> 57-year-old woman with a long history of Bechet syndrome, with many cutaneous and mucosal ulcerative lesions superimposed on other problems which include prior obesity and gastric bypass with associated problems . . . . She has been intermittently on steroids in the past but none recently, and receives periodic IVIG therapy and rituximab to control the mucocutaneous

---

("reject[ing] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions.")

> manifestations of her disease.  Chronic pain is a significant issue, with the patient requiring substantial amounts of opioid on a regular basis, which she is trying to gradually taper.

(*Id.*)  Dr. Ehresmann did not mention reactive arthritis in this letter.

Petitioner was seen for a cardiology evaluation by Dr. Matthews on April 13, 2016.  (Ex. 9, pp. 31106-08.)  Dr. Matthews noted that petitioner was "a challenging history teller and speaks with rapid pressured speech and expands off into tangents." (Ex. 9, p. 31106.)  He discerned that petitioner had some chest discomfort which she believed was congestive heart failure.  (*Id.*)  Petitioner had an abnormal ECG which was consistent with hibernating myocardium.  Dr. Matthews listed petitioner's Bechet's, gastric bypass, skin lesions, and other symptoms in petitioner's medical history, but did not include reactive arthritis.  (Ex. 9, pp. 31106-08.)

Dr. Ehresmann wrote another letter on May 3, 2016, this time addressed to an attorney and regarding a dispute with petitioner's credit union.  (Ex. 9, pp. 27610-11.) The letter explains petitioner's medical history and requests that it be considered a "major medical hardship."  (*Id.*)  Dr. Ehresmann mentioned petitioner's "severe systemic illness" associated with Bechet's syndrome, a "traumatic injury" which "further compromised" her functional capacity, and a possible "significant cardiac issue, for which she needs some additional medical and radiographic evaluations."  (*Id.*)  Dr. Ehresmann did not mention reactive arthritis.  (*Id.*)

Petitioner received an IVIG infusion at Keck Hospital on July 6, 2016.  (Ex. 9, 30243.)  Prior to her infusion, petitioner reported to Dr. Ehresmann for a follow up on her right ankle ganglion cyst pain.  (Ex. 9, p. 30690.)  Dr. Ehresmann listed a variety of problems in petitioner's chart including Bechet's, goiter, osteoarthritis, anemia, and hypothyroidism.  (Ex. 9, p. 30691.)  Although he also listed "other specified disorders of ankle and foot joint" he did not specifically mention reactive arthritis.  (*Id.*)

On November 13, 2016, Dr. Ehresmann wrote another letter on petitioner's behalf, this time to Banning Superior Court requesting that she be provided additional time in a court proceeding that appears to have been related to the dispute with her credit union and a foreclosure on her home.  (Ex. 9, pp. 29748-50.)  Dr. Ehresmann explained that petitioner's "systemic medical illness" was associated "with many painful ulcerative skin lesions, as well as systemic complications and the need for complex medical treatments and medications."  (*Id.* at 29748.)  Dr. Ehresmann did not mention reactive arthritis in this letter.  (Ex. 9, pp. 29748-50.)

Petitioner once again saw Dr. Ehresmann for a follow up on her Bechet's on December 6, 2016.  (Ex. 9, pp. 29311-14.)  Dr. Ehresmann noted petitioner's gastric bypass, chronic absorption difficulties, lumbar disc disease, foot/ankle ganglion, hypertension, hypothyroidism, goiter, microcytic anemia, osteoarthritis involving her knees, and post-contusion pain in her hips.  (*Id.* at 29311.)  Petitioner's physical exam revealed patellofemoral bilateral knee pain, trochanteric tenderness, and bilateral

guarding of hip range of motion, with no signs of proliferative synovitis.  (Ex. 9, p. 29313.)  Dr. Ehresmann's impression included Bechet's, gastric bypass, iron deficiency, hypertension, coronary artery disease, hypothyroidism, goiter, osteoarthritis, hip trauma, and panic symptoms, but did not mention reactive arthritis.  (Ex. 9, p. 29314.)

Dr. Ehresmann wrote another letter for petitioner on January 18, 2017, this time addressed to petitioner's insurance reviewer for pharmacy benefits.  (Ex. 9, p. 29348.)  In his letter, Dr. Ehresmann explained that petitioner's Bechet's syndrome had caused "painful deep ulcers in various body areas that have been refractory to many therapies but somewhat improved with IVIG and B-cell depletion with rituximab."  (*Id.*)  Dr. Ehresmann also noted that petitioner had "significant back disease and osteoarthritis of the knees and hip symptoms post-contusions."  (*Id.* at 29349.)  Dr. Ehresmann again did not mention reactive arthritis.

On February 28, 2017, petitioner received an IVIG infusion and a steroid injection in her left knee at Keck Medicine.  (Ex. 9, p. 29065.)  Petitioner reported that she felt very tired and complained about the hospital food but did not mention anything about arthritic pain.  (*Id.*)  She also received x-rays of her left shoulder, pelvis, and both elbows, knees, and ankles.  (*Id.* at 28670-77.)  Her shoulder x-ray revealed mild bilateral acromioclavicular osteoarthrosis and diffuse osteopenia.  (*Id.* at 28670.)  Her elbow x-ray showed osteopenia and mild ulnotrochlear osteoarthrosis with small osteophyte.  (*Id.* at 28673.)  Her pelvic x-ray showed no acute osseous abnormality, mild bilateral hip osteoarthrosis, mild degenerative changes of the pubic symphysis, and diffuse osteopenia.  (*Id.* at 28674.)  Her ankle x-ray showed moderate to severe right talonavicular arthrosis, mild arthrosis involving left talonavicular and bilateral calcaneocuboid joints with a possible inflammatory etiology, small bilateral tibiotalar joint effusions, and diffuse osteopenia.  (Ex. 9, p. 28675.)  Her knee x-ray showed symmetric mild bilateral medial and lateral tibiofemoral compartment joint space narrowing, mild bilateral patella, small bilateral knee joint effusions, and diffuse osteopenia.  (*Id.* at 28677.)

Dr. Ehresmann wrote another letter on May 2, 2017 addressed to a judge of the Pomona County Superior Court in Los Angeles, California, seeking to delay petitioner's case six to eight months on account of her medical condition.  (Ex. 9, p. 33356-57.)  The nature of the case at issue is not indicated.

Petitioner received another IVIG infusion at Keck Medicine on July 17, 2017.  (Ex. 9, pp. 32729-33.)  She reported open lesions on her abdomen and legs, and increasing pain in her left knee and both ankles where she had radiographic osteoarthritic changes.  (*Id.* at 32729.)  Petitioner's problem list at this visit included anemia, Bechet's, goiter, edema, ganglion, gastric bypass, hypertensive disorder, hypothyroidism, osteoarthritis, vitamin B deficiency, and other specified disorders of ankle and foot joint.  (*Id.*)  Although none of petitioner's records of this visit mention reactive arthritis, the multidisciplinary forms do state that petitioner "had a severe adverse reaction with tetanus vaccine in the past."  (*Id.* at 33039.)  Petitioner was discharged from her inpatient IVIG infusion on July 18, 2017.  (*Id.* at 32687.)  On

discharge, petitioner noted that she was concerned that her Tdap vaccination "precipitated growths in her joints and tendons that are worsening . . . ."  (Ex. 9, p. 32687.)

Petitioner received steroid injections in both ankles and her left knee as well as a ganglion cyst aspiration on August 9, 2017.  (*Id.* at 33024-25.)

Petitioner returned to Keck Medicine on September 7, 2017 for an inpatient IVIG infusion.  (*Id.* at 32025.)  During this visit, petitioner noted that "since her last IVIG infusion, her diffuse arthralgia symptoms worsened over the last 4 weeks and she started developing a bitemporal frontal headache that was chronic and worsening progressively over the last couple of days."  (*Id.*)  She described her headache as "dull . . . with some sharp spikes in intensity and the sensation of some neck tightness."  (*Id.*)  Petitioner also reported diffuse pain in her joints, most notably the bilateral DIP and PIP joints of both hands.  (*Id.*)

Petitioner was also seen by her primary care physician Dr. Donna Shoupe for a routine checkup on September 7, 2017.  (Ex. 9, p. 35219.)  Petitioner's history of present illness included Bechet's, gastric bypass, arthritis, and notes that petitioner "feels [that she] reacted to [the] tetanus vaccine", however Dr. Shoupe did not opine on petitioner's alleged vaccine reaction in this record.  (*Id.*)  Petitioner's problem list at this visit included anemia, Bechet's, goiter, edema, abnormal gynecological exam, flexor tenosynovitis of finger, ganglion of tendon sheath, history of gastric bypass, hypertensive disorder, hypothyroidism, osteoarthritis, osteoporosis, other specified disorders of ankle and foot joint, vaginal atrophy, and vitamin B deficiency.  Reactive arthritis was not included in this record.  (*Id.*)

Petitioner was next seen by Dr. Ehresmann on October 11, 2017 for redness and edema in her left leg.  (Ex. 9, p. 34360.)  Petitioner reported that she had multiple episodes of stabbing abdominal pain, complained of increased urinary urgency, mild eye burning, and discomfort in the left side of her throat.  (*Id.*)  Petitioner did not report any arthritic issues nor were any arthritic issues observed on examination.  (*Id.*)

Petitioner received another IVIG infusion at Keck Medicine on October 12, 2017.  (*Id.* at 34315.)  Petitioner "stated that she had worsened headache, neck tightness, and pain at her DIP and PIP joints since her last [IVIG infusion]. Her headache is dull and intermittent. She did not have associated nausea, vomiting, vision changes, lightheadedness, and fever/chills."  (*Id.* at 34315.)

On November 22, 2017, Dr. Ehresmann wrote another letter to Pomona County Superior Court describing petitioner's condition and requesting that her court date be continued.  (Ex. 9, p. 34393.)  Dr. Ehresmann noted that petitioner's symptoms included open lesions, kidney function abnormalities, anemia, weakness, osteoarthritis, and cardiac compromise.  (*Id.* at 34393-94.)  He did not mention reactive arthritis.  (*Id.*)

Petitioner was seen again by Dr. Ehresmann on January 9, 2018 for a follow up on her osteoarthritis and emerging throat issues. (Ex. 9, p. 35780.) She complained of a lesion in her throat, skin lesions, eye pain, foot pain, abdominal pain, a thyroid nodule, and left sided throat pain. (*Id.*) Petitioner's exam revealed no inflammatory arthritis, some guarding bilateral crepitation in the hips and knees, no instability, left foot ganglion, no edema, no clubbing, no synovitis, bilateral ephemeral arthritis, no effusion, no ankle synovitis, and decreased size in petitioner's ganglion. (*Id.* at 35781.) Dr. Ehresmann's assessment included flexor tenosynovitis, cervical radiculopathy, diffuse goiter, ganglion of the tendon sheath, osteoarthritis, osteoporosis, splenic lesion, thoracic arthritis, and thyroid nodule. (*Id.* at 35781-82.) He did not mention reactive arthritis in this record. (*Id.*)

Petitioner returned to Dr. Ehresmann on February 20, 2018 for a follow up on her osteoarthritis and Bechet's. (Ex. 9, p. 39355.) During this visit petitioner complained of open sores, neck pain, and a lesion in her ear. Petitioner's assessment remained unchanged, and Dr. Ehresmann again did not include reactive arthritis from his diagnosis. (*Id.* at 39355-39358.)

On February 21, 2018, petitioner was seen by Dr. Loni Tang at Keck Medicine. (Ex. 9, p. 39349.) Petitioner was in Los Angeles and requested an IVIG infusion out of convenience since she typically commuted from Palm Springs. She reported having some tendonitis related to her earlier tetanus shot, but her EMG was negative. Her ongoing problem list was largely unchanged from her previous records, with the addition of hoarseness and splenic mass. Dr. Tang's record does not reflect any observation of arthritis or memorialize any complaints from petitioner regarding arthritis. (*Id.* at 39349-52.)

On March 20, 2018, petitioner was seen by Dr. Ehresmann for radiculopathy, osteoporosis, and osteoarthritis. (Ex. 9, p. 38708.) Petitioner reported pain in her right lateral side, cervical spine, and "crunching" in her left elbow and wrist. (*Id.*) She requested a B12 injection and a letter to Pomona County Superior Court regarding her inability to represent herself in court. She also requested a letter to the California Department of Health Services recommending she be temporarily excluded from medical managed care plans. (*Id.* at 38708-09.) Her exam revealed bilateral tenderness in her AC and glenohumeral joints, some degenerative mid-foot osteoarthritis changes bilaterally, primary osteoarthritis in her hands, and patellofemoral crepitus in both knees. (*Id.*) There is no mention of reactive arthritis in this record.

Dr. Ehresmann wrote two letters on March 20, 2018, one to Pomona County Superior Court and one to the California Department of Health Care Services. (Ex. 9, pp. 38752, 38754.) In both letters, Dr. Ehresmann referenced petitioner's difficulty with treatment and discussed her complicated osteoporosis. (*Id.*) However, he did not mention reactive arthritis in his letter to the judge. He did, however, mention in his letter to the California Department of Health Care Services that petitioner "developed a severe set of symptoms following immunization for tetanus about 2 years ago and has

had progressive joint pain and other complicating symptoms since that time." (*Id.* at 38754.)

Finally on May 11, 2018, petitioner reached out to Dr. Ehresmann reporting that she was experiencing left ear pain, mild pain in her jaw, inflammation in both hands, a noticeable change in her lesions, spinal cord pain, and "horrible" pain in her feet. (Ex. 9, p. 38225.)  Petitioner reported that she felt all of these symptoms were the result of her Prolia medication and that she would not be able to take the Prolia without methadone. (*Id.*)

### b.  As described in testimony

#### i.  Petitioner's affidavit

Petitioner filed an affidavit, signed September 18, 2018, describing the course of her condition.  (Ex. 1.)  She stated that prior to vaccination, around the age of forty, she began feeling unwell.  She was seen by Dr. Ehersmann who diagnosed her with Bechet's disease.  Petitioner's symptoms "took [her] out of normal life," and the fatigue was so intense that petitioner struggled to lift a roll of toilet paper.  (Ex. 1, p. 1.)

Petitioner explained that Bechet's is a multi-system disorder which made her IVIG dependent.  This means that petitioner is hospitalized each month to receive IVIG infusions.  During the first 15 years of her disease, petitioner would receive her infusions at Norris Cancer Day Hospital, but then switched to USC's Keck Hospital.  (*Id.*)

When petitioner began her IVIG therapy, it "helped intensely."  (Ex. 1, p. 1.)  She described her disease as a lifelong condition which causes severe lesions in her mouth and all over her body.  Petitioner explained that in 2009, she had over 200 open lesions on her body, and because the nerve endings are at skin level, the lesions are agonizing and "similar to being in a fire."  She also experienced fevers, chills, and skin necrosis. (*Id.*)  Petitioner explained that prior to her vaccination, she was using one type of pain medication for her condition and another for "in-between pain," but stated that she "was nearly completely off of them prior to vaccination."  (*Id.* at 2.)

Petitioner stated that she cut her finger October 22, 2015 and went to Beaver Medical Group where she received stitches and a tetanus vaccination. She reminded the physician about her autoimmune condition but was assured that she would be fine. Petitioner notes that at this time she was already told that she was not to receive the pneumonia vaccine.  (*Id.*)

A few weeks later, petitioner reported "feeling different."  (Ex. 1, p. 2.)  She stated that "maybe a week and a half after getting the stitches out, I started having headaches and felt pain in my left arm."  (*Id.*)  Although petitioner did not think much of this, she told her doctor who thought the pain was caused by petitioner's weaning off narcotics. Petitioner told her doctor that "[i]t felt like everything changed to a much higher level of pain from [her] toes to [her] brain."  (*Id.*)

Petitioner described feeling painful spasms in her muscles that brought her to tears.  She began treating her pain with narcotics, and stated that she began to consider whether these new sensations were related to her tetanus vaccination.  She noted experiencing a stiff neck and right shoulder pain that switched to her left shoulder and left arm.  She reported that "it felt like nerve pain with pain all over my body." Petitioner explained that this pain continued throughout 2016, and that in February of 2016 she began to experience a painful bone crunching sensation in her left and right elbow. (Ex. 1, p. 2.)

In May of 2016, petitioner felt that the bone crunching sensation affected her whole body.  She noticed terrible pain in the joints of her fingers and toes in "the exact same place on every finger and toe."  She noticed that each of her knuckles were very painful and swollen, and that her mind was also affected, causing her to have difficulty organizing her thoughts.  (*Id.*)

Petitioner averred that she was diagnosed with reactive polyarthritis, and that Dr. Ehresmann associated this diagnosis to petitioner's tetanus vaccination.  (*Id.*)

## ii.  Dr. Ehresmann's Letter

On July 16, 2020, petitioner filed a letter dated July 14, 2020 from her treating rheumatologist, Dr. Glenn Ehresmann, addressed to petitioner's counsel, Mr. Downing. (Ex. 8.)  Dr. Ehresmann begins his letter explaining that Bechet's  is "a rare chronic multisystem inflammatory disease which has prominent mucosal and cutaneous ulcerative lesions as the major manifestation for [petitioner]."  (Ex. 8, pp. 1-2.) According to Dr. Ehresmann, Bechet's may have various manifestations including central nervous system involvement, ocular involvement, genital involvement, or other mucosal or cutaneous manifestations. (*Id.* at 2.)

Dr. Ehresmann explains that petitioner's treatment has included IV infusions of rituximab and antibodies to B cells which seemed to be driving petitioner's disease.  He explains that B-cell depletion has been "partially effective in controlling the number and intensity" of petitioner's lesions, but that petitioner's immunoglobulin level dropped, placing her at risk for complicating infections.  (Ex. 8, p. 2.)  Consequently, she has received monthly IVIG infusions, which have also had positive effects on her Bechet's disease.  (*Id.*)

Dr. Ehresmann also indicates that petitioner has evidence of osteoarthritis characterized by mild changes in several of her joints evidenced on x-rays over the past ten years.  Petitioner also has coronary artery disease which was stable at the time he wrote his letter.  Although a cardiologist recommended further evaluation of petitioner's coronary disease, Dr. Ehresmann reports that petitioner's illness precluded her from completing some of the recommended studies.  Dr. Ehresmann notes that it is unsurprising that petitioner shows signs of osteoporosis due to her sedentary lifestyle and complications related to her vaccination.  Petitioner also has a large goiter but no

evidence of hyperthyroidism which Dr. Ehresmann explains would lead to worsening osteoporosis.  (*Id.*)

Dr. Ehresmann further explains that prior to her immunization, petitioner's medical status was relatively stable with recurrent cutaneous ulcers requiring rituximab and IVIG, but nothing that required chronic corticosteroid therapy.  (*Id.*)  After her vaccination, Dr. Ehresmann reports that petitioner developed pain in her shoulders and other areas that were not involved in her Bechet's symptoms.  In the five years preceding his letter, he explains that her symptoms of joint pain "have been far out of proportion to any radiographic changes associated with what has been described in the report" as "mild osteoarthritis."  (*Id.*)

Dr. Ehresmann states that petitioner has also experienced symptoms that suggest an enthesitis[5] involving her achilles and biceps tendons, as well as joint pain in her hands that "felt like her digits were breaking off" even though the changes exhibited on her x-rays taken as recently as May 2020 were described as "minimal osteoarthritis at the thumb carpometacarpal joints."  (Ex. 8, p. 2.)  Additionally, Dr. Ehresmann points out that petitioner complained of "exquisite pain in the hips bilaterally to the point of severe difficulty walking," in March of 2016, and her x-rays only showed "very mild joint space narrowing with minimal marginal osteophytes . . . ."  (*Id.* at 2-3.)  Dr. Ehresmann also notes a February 2017 radiology report which "confirmed evidence of right talonavicular arthrosis with extension into adjacent areas with enough synovitis that the doctor suspected an inflammatory etiology."  (*Id.* at 3.)  However, he notes that petitioner's inflammatory markers including her sedimentation rate and CRP were typically low or normal in her routine lab work.  Dr. Ehresmann explains that petitioner's MRIs have shown tibiotalar joint effusions consistent with an inflammatory response and not simply degenerative changes.  (*Id.*)  Dr. Ehresmann believes that petitioner's joint symptoms "cannot be explained by her Bechet's nor the minimal degenerative changes that are present radiographically."  (*Id.*)

According to Dr. Ehresmann, petitioner also experienced neuropathic symptoms which were evaluated by EMG/NCS studies that excluded any sort of entrapment neuropathy.  Diabetic neuropathy was not considered because petitioner was not found to be diabetic.  Dr. Ehresmann believes that there may, however, be a component of small fiber neuropathy that could not be confirmed on EMG/NCS.  Because all of these symptoms evolved following petitioner's vaccination, Dr. Ehresmann believes that they are "certainly consistent with post-vaccination responses."  (*Id.*)   Dr. Ehresmann explains that petitioner's esophageal dysfunction may be neuropathic in nature as well given that no mechanical abnormality was ever discovered on evaluation.  (Ex. 8, p. 3.) He continues that petitioner's esophageal study did not suggest Bechet's or other tissue disease were to blame.  (*Id.* at 3-4.)

---

[5] "Enthesitis" is "inflammation of the muscular or tendinous attachment to bone." *Dorland's Illustrated Medical Dictionary*, 33rd Ed. (2020), p. 620.

Dr. Ehresmann concludes his letter by explaining that although petitioner endured many difficult symptoms as a result of her Bechet's illness prior to her vaccination, her inflammatory joint pain and neuropathic symptoms only arose after she received her tetanus vaccination.  Because no other process can explain the onset of these symptoms, Dr. Ehresmann concludes that petitioner's tetanus vaccination "resulted in a reactive arthropathy superimposed on any pre-existing degenerative change, which was very modest. The neuropathic symptoms are also attributed to the tetanus vaccination." (*Id.* at 4.)  Dr. Ehresmann acknowledges that "Bechet's disease can certainly have neurologic sequelae," but that "the absence of any nerve conduction or EMG abnormalities favors another etiology." (*Id.*)

### III.   Party Contentions

In her motion, petitioner contends that her sworn statement "uncontrovertibly places onset a few weeks after vaccination." (ECF No. 37, p. 13.)  She also contends that Dr. Ehresmann's February 3, 2016 letter corroborates her account.  She argues that "Dr. Ehresmann is the treating physician in the best position to comment upon onset, not only because he was familiar with [petitioner's] autoimmune disease for years prior to vaccination, but also because he witnessed first-hand the dramatic change she underwent after vaccination." (*Id.* at 13.)  Petitioner also explains that although Dr. Ehresmann did not create contemporaneous records of the observations upon which his letters are based, the date of Dr. Ehresmann's February 3, 2016 letter corresponds to the date of petitioner's IVIG infusion and therefore should qualify as a contemporaneous record.[6] (*Id.* at 13-14) (Ex. 9, pp.27010-27013, *accord* Ex. 9, p. 27199).

Respondent counters that petitioner has not established her diagnosis by preponderant evidence.  (ECF No. 40, p. 18-19.)  He argues that "the contemporaneous medical records are clear that there is no objective evidence in the record to support petitioner's allegation of a reactive polyarthritis diagnosis." (*Id.* at 19.)  Respondent notes that Dr. Ehresmann never listed reactive polyarthritis as petitioner's diagnosis in any of his medical records as her treating physician, and that no other examination or clinical notes in the record reflect such a diagnosis.  Further, respondent argues, Dr. Ehresmann never reported such a diagnosis in any of his referrals to other specialists and only treated petitioner for her Bechet's and osteoarthritis following her vaccination. (*Id.*)

---

[6] The fact that Dr. Ehresmann's observations stem from his interactions with petitioner during IVIG infusion encounters is not explicitly stated in Dr. Ehresmann's July 14, 2020 letter. (Ex. 8.)  This representation was first provided by petitioner's counsel during a status conference. (ECF No. 35.)  After the parties agreed to proceed via a motion for a fact finding, I instructed petitioner's counsel to include this representation in petitioner's motion for the record. (*Id.*)  In the motion, petitioner's counsel indicates: "the Special Master requested that 'petitioner shall also include for the record counsel's own description of Dr. Ehresmann's explanation that his observations were based on encounters in the infusion labs, and not separate encounters.'  That is precisely what Dr. Ehresmann relayed to the undersigned as far as why there are not separate encounter reports that correspond with his substantive letters." (ECF No. 37, p. 13 (internal citation omitted).)

Respondent categorizes Dr. Ehresmann's final letter at Exhibit 8 as one drafted "for litigation purposes" and argues that Dr. Ehresmann's conclusion that petitioner's tetanus vaccine led to "a reactive arthropathy superimposed on any pre-existing degenerative change," is not supported by any of the other medical records and "appears to be driven by petitioner's insistence alone that she had a vaccine injury." (*Id.*)  Respondent believes that "as Dr. Ehresmann has done numerous times before, he drafted the letter . . . at the request of petitioner.  That letter, like the ones he drafted before, conflict[s] with the contemporaneous medical records and should be afforded little to no weight."  (ECF No. 40, p. 20.)  Further, respondent notes that petitioner's medical records are "rather extensive and detailed," but fail to make any mention of reactive polyarthritis, and contain no clinical basis for such a diagnosis.  (*Id.*)

With regard to onset of petitioner's condition, respondent also argues that petitioner has failed to provide preponderant evidence supporting the contention that her symptoms began within a few weeks of her vaccination.  (*Id.*)  Respondent notes that petitioner did not report any of the symptoms that she associated with her vaccination until over a year after the fact, and that "the medical records are silent regarding the symptoms petitioner allegedly suffered from during the weeks following vaccination.  In fact, it was not until July 17, 2017 that petitioner reported increasing pain in her left knee and both ankles where she had radiographic osteoarthritis changes . . . ."  (ECF No. 40, p. 21.)  Respondent further contends that it was not until March 20, 2018 that petitioner complained of "pain in her right lateral side and cervical spine as well as 'crunching' in her left elbow and left wrist."  (*Id.*)  Respondent argues that petitioner's account consists of "*post hoc* statements that conflict with the contemporaneous medical records," and should be afforded little to no weight.  (*Id.*)  To further support this argument, respondent notes that petitioner "has a history of reaching out to providers to make requests and to report issues and pain.  However, during the time of the alleged onset . . . she did not report any of the symptoms outlined in her affidavit . . . despite numerous opportunities to do so."  (*Id.* at 21-22.)

Respondent contends that, although Dr. Ehresmann stated that prior to vaccination petitioner had no symptoms of the inflammatory joint pain or severe neuropathic symptoms which developed post-vaccination, petitioner's prior medical history was significant for joint pain, fibromyalgia, osteoarthritis, and chronic pain with neuropathic and mechanical features.  (*Id.* at 22.)  Respondent also notes that Dr. Ehresmann wrote in his letter that petitioner's medical status was stable, and that she did not require chronic corticosteroid therapy, even though approximately six months prior to her vaccination he had planned to administer an intraarticular steroid injection, and had pre-ordered several others.  (ECF No. 40, p. 22.)  Respondent ultimately argues that Dr. Ehresmann's letter, the primary piece of evidence petitioner uses to corroborate her account of events, is in conflict with the contemporaneous records and should be afforded little to no weight.  (*Id.* at 23.)

Petitioner's reply asserts that Dr. Ehresmann's letter should be afforded substantial weight because it comes from petitioner's treating rheumatologist based on his own contemporaneous observations, even though they were recorded years after

the fact.  (ECF No. 41, p. 2.)  Petitioner disagrees that Dr. Ehresmann's letter conflicts with the contemporaneous medical records, but does not cite any specific records to support this assertion.  (*Id.* at 3.)  Petitioner argues that her post-vaccination symptoms were clearly different from her well-established medical baseline.  (*Id.*)  Petitioner further explains that "Bechet's . . . is a chronic, lifelong autoimmune disease.  The fact that Dr. Ehresmann continues to treat [petitioner's] chronic illness bears no relevance to the case."  (*Id.*)

Petitioner explains that although there are no contemporaneous records created by Dr. Ehresmann on February 3, 2016, this date "corresponds to [petitioner] being at the facility for her monthly treatments . . . which reflects an admission date of February 3, 2016 . . . entered by Dr. Ehresmann that same day," and argues that the Gallant Medical Supply letter be treated as a contemporaneous record.  (ECF No. 41, p. 4.)  Petitioner argues that Dr. Ehresmann's March 3, 2016 letter linking her tetanus immunization to her exacerbated pre-existing medical conditions resulting "in a reactive polyarthritis," is enough to carry her burden.  (ECF No. 41, p. 7) (citing Ex. 9, p. 27200).)

## IV.    Legal Standard

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 13(b)(1)(A).  The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).  Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence.  A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).

## V.    Discussion

Petitioner's motion asks that I find that petitioner was diagnosed with reactive polyarthritis and that her symptoms began within "a few weeks" of her vaccination. (ECF No. 37, p. 14.)  This alleged condition arises in the context of a complicated medical history.  In support of her allegations petitioner stresses her affidavit as well as Dr. Ehresmann's July 14, 2020 letter to Mr. Downing written for purposes of this claim and his earlier February 3, 2016 letter to Gallant Medical Supply. These letters raise a rare circumstance, because they are documents created by a treating physician that do not constitute medical records generated in the ordinary course of treatment.  Resolving this motion requires answering several questions:  First, how should Dr. Ehresmann's

14

observations recorded outside the context of diagnosis and treatment be weighed? Second, which of the symptoms petitioner attributes to her alleged reactive polyarthritis have been shown by preponderant evidence to have arisen within weeks of the vaccination at issue as petitioner contends?  And, finally, in light of the answers to the preceding questions and the record as a whole, was Dr. Ehresmann's assessment of reactive polyarthritis reliably reached?  This decision answers the first two of these questions, but additional development of the record is necessary to resolve the third.

### a.  The Nature of Dr. Ehresmann's Letters

A threshold question posed by this case is how to characterize and weigh the statements made by Dr. Ehresmann in his July 14, 2020 letter to Mr. Downing and his February 3, 2016 letter to Gallant Medical Supply.  Dr. Ehresmann's letters place in tension two considerations that arise often in the context of this program and are usually viewed as harmonious - the value of treating physician opinions and the value of contemporaneous medical records.  Petitioner focuses on the former consideration.  (ECF No. 41, p. 2.)  Respondent, however, emphasizes the latter consideration.  (ECF No. 40, p. 20.)

Although the opinions of treating physicians are not binding (*see* § 13(b)(1)), the Federal Circuit has recognized that "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Capizzano v. Sec'y of Health & Human Servs.,* 440 F.3d 1317, 1326 (Fed. Cir. 2006) (quoting *Althen v. Sec'y of Health and Human Servs.,* 418 F.3d 1274, 1280 (Fed. Cir. 2005)).  Accordingly, such opinions are often considered "quite probative." *Id.*  This logic has also been applied in the context of diagnosis. *See, e.g., D'Angiolini v. Sec'y of Health & Human Servs.*, No. 99-578V, 2014 WL 1678145, at *24 (Fed. Cl. Spec. Mstr. Mar. 27, 2014) (finding a treating physician's opinion regarding diagnosis "worth a great deal" and "almost definitive evidence on that point"), *mot. for rev. denied*, 122 Fed. Cl. 86 (2015), *aff'd*, 645 F. Appx. 1002 (Mem.) (Fed. Cir. 2016).  As petitioner alludes, the extra weight often assigned treating physician opinions is premised on the notion that, in addition to being qualified to offer a medical opinion, the treating physicians were eyewitnesses with personal knowledge of the unfolding of a petitioner's condition.  *Nuttall v. Sec'y of Health & Human Servs.*, 122 Fed. Cl. 821, 832-33 (2015) (explaining that the Federal Circuit "found that a treating physician who was familiar with the patient both before and after the alleged vaccine injury is likely to be in a better position than an expert retained after the fact" to opine with respect to vaccine causation), *aff'd* 640 Fed. Appx. 996 (Mem.) (Fed. Cir. 2016).

However, while treating physician opinions expressed in written records are considered very often in this program, treating physician testimony is comparatively rare.  Although special masters are obligated to consider only medical opinion that has a reliable basis, cross-examination of treating physicians is generally not considered necessary because their own medical records are in themselves generally considered facially trustworthy. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1383 (Fed. Cir. 2009) (citing *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525,

1528 (Fed. Cir. 1993).)  Reliance on medical records as trustworthy evidence is in turn premised on two primary considerations.  First, the recordings are contemporaneous to events.  Second, they reflect information supplied to physicians specifically for the purpose of diagnosis and/or treatment, which is thought to include a motivation for accuracy.  *Cucuras*, 993 F.2d at 1528.  Thus, where medical records are clear, consistent, and complete, they ordinarily receive substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

However, there is no presumption that medical records are complete as to all of a patient's conditions.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 182-83 (Fed. Cir. 2021).  Afterall, "[m]edical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).  And, importantly, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting the decision below), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992).  The *Murphy* Court also observed that "[i]f a record was prepared by a disinterested person who later acknowledged that the entry was incorrect in some respect, the later correction must be taken into account."  *Murphy*, 23 Cl. Ct. at 733.

Nonetheless, when a treating physician offers a statement that is not contemporaneous to events and is not within the context of diagnosis and treatment, a special master does not err in concluding that it is not entitled to the same deference as contemporaneous medical records, even records created by the same physician.  *See Milik v. Sec'y of Health & Human Servs.*, 822 F.3d 1367, 1381-82 (Fed. Cir. 2016).  For example, in *Milik*, a treating physician recorded in his initial treatment record that a child's developmental delay had been "longstanding" in contrast to an "acute" onset of limping.  *Id.*  In a much later letter written to the court, the doctor sought to recharacterize the word "longstanding" as meaning in effect only preexisting, which the special master thought incompatible with the original record that contrasted "longstanding" against "acute."  *Id.*  The Federal Circuit held that it was not error for the special master to credit the plain meaning of the original treatment record over the physician's subsequent reinterpretation of the notation.  *Id.*

Although witness testimony (or other evidence) may be offered to overcome the weight afforded to contemporaneous medical records, such evidence, most notably testimonial evidence, must be "consistent, clear, cogent, and compelling."  *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, the Special Master must consider the credibility of the individual offering the testimony.  *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).  In determining whether to afford greater weight to contemporaneous medical records or other evidence there must be evidence that this decision was the result of a rational determination.  *Burns v. Sec'y*

*of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.

Here, petitioner and Dr. Ehresmann had an established doctor-patient relationship both before and after the vaccination at issue in this case.  Moreover, petitioner was presenting repeatedly for treatment of her Bechet's disease during the relevant period.  Additionally, Dr. Ehresmann is a rheumatologist, which places the condition of reactive polyarthritis allegedly at issue within his area of qualification. Accordingly, Dr. Ehresmann is positioned to be credited as a treating physician and his opinion would clearly be entitled to significant weight when presented in the context of a facially trustworthy contemporaneous medical record.  Critically, however, the statements by Dr. Ehresmann relied upon by petitioner do not stem from any of petitioner's actual treatment records.

In contrast to the statements contained in his letters, Dr. Ehresmann's contemporaneous medical records are clear and consistent in providing no indication that Dr. Ehresmann separately treated petitioner for reactive polyarthritis.  It is true both that the absence of any notation is potentially less significant than a contradictory notation and that there is no presumption that petitioner's individual medical records would be complete as to all of her complaints; however, petitioner's contemporaneous medical records demonstrate a total absence of relevant record notations over an extended period despite her pattern of encounters with Dr. Ehresmann.  Although Dr. Ehresmann and petitioner reportedly discussed her alleged reactive polyarthritis in the context of her infusion treatment for her Bechet's disease, Dr. Ehresmann never recorded these conversations in medical records for these encounters.  Nor did he create separate encounter records relating to petitioner's alleged reactive polyarthritis. He never recorded reactive polyarthritis as a diagnosis in petitioner's medical records and never identified any treatment plan for that specific condition in any of his medical records. This is not merely a matter of Dr. Ehresmann having failed to record all of the details of his interaction with petitioner.  Dr. Ehresmann's treatment records do not reflect any pattern of care, concern, or treatment, regarding the alleged diagnosis nor any follow up specifically directed at monitoring the course of that condition.

The suggestion that petitioner used her recurring IVIG infusion appointments as an opportunity to voice complaints to Dr. Ehresmann is understandable.  The idea that Dr. Ehresmann would receive these complaints as diagnostic of a significant new condition without acting accordingly is far less understandable.  Instead, Dr. Ehresmann's conduct as reflected by his treatment records is entirely in keeping with an understanding that petitioner's ongoing course of symptoms remained consistent with the chronic conditions which he was already treating rather than any new onset of a separate reactive polyarthritis.  Petitioner's contemporaneous medical records consistently list several medical conditions that petitioner dealt with for years before and after her vaccination including, *inter alia*, Bechet's, goiter, hip trauma, ganglion cysts,

osteoarthritis, anemia, hypothyroidism, and joint pain.  (*Compare* Ex. 9, pp. 31106-08, 30691, 29311, 32729, 35219, 35781-82 (post-vaccination) and Ex. 9, pp. 13789-92, 15113-15, 21747, 21749-52, 21752-55, 24111, 24546-47, 24555-56 (pre-vaccination).) These conditions are consistently listed in assessments, medical histories, lists of active medical problems, symptoms, and exam findings.  (*Id.*)  Ultimately, based on the entirety of the record, it appears that Dr. Ehresmann never formally diagnosed petitioner with reactive polyarthritis, and instead, only mentioned it once in a letter drafted to assist petitioner in obtaining a motorized wheelchair, and once in a letter written to advance this claim.  (*See* Ex. 9, pp. 27199-201; Ex. 8.)

Petitioner argues that the Gallant Medical Supply letter should qualify as a contemporaneous record because it was drafted on the same day that petitioner received an IVIG infusion, and thus it is based on observations that Dr. Ehresmann made during petitioner's infusion.  (ECF No. 41, pp. 4, 6-7.)  However, while I accept that Dr. Ehresmann's letter does reference a face-to-face interaction that aligns with petitioner's presentation for IVIG treatment, the letter was not drafted for purposes of diagnosis or treatment.  Nor is there is any confirmation in that letter that Dr. Ehresmann conducted an actual physical examination of petitioner on the date that he drafted this letter, either separately or during her IVIG infusion.  The only medical record that exists for this date is a list of orders that Dr. Ehresmann made for petitioner's monthly treatments.  (Ex. 9, pp. 27010-27013.)  Dr. Ehresmann's February 3, 2016 letter is itself entirely silent as to the nature or extent of his evaluation.  Nor is there is any reference to any specific finding or observation that would allow Dr. Ehresmann to conclude that the complaint of increased upper extremity pain – the only symptom discussed by Dr. Ehresmann at that time – constituted reactive polyarthritis or was in itself sufficient to diagnose reactive polyarthritis.  In contrast, petitioner's affidavit suggests that one of her treating physicians (unnamed) felt her increased pain was instead likely due to reducing her narcotic medication. (Ex. 1, p. 2.)

Dr. Ehresmann's references to reactive polyarthritis appear exclusively in the context of advocating for additional resources for his patient from third parties (to secure a motorized wheelchair in the first instance and to support this claim for compensation in the second instance). Dr. Ehresmann has, in fact, written letters on petitioner's behalf on multiple other unrelated occasions as well.  Dr. Ehresmann drafted 10 other letters for a variety of reasons including to help petitioner secure special considerations from her credit union (*Id.* at 11694-95, 27610-11), to postpone court appearances on six different occasions (*Id.* at 29748, 32762-63, 33356, 34392-94, 38749-51, 38752), to help petitioner obtain quantities of morphine that Dr. Ehresmann described as significant (*Id.* at 29348-49), and to opine on the cause of petitioner's severe gastroenteritis, which appears to be related to an evaluation of a claim made by petitioner against an insurance policy relative to an alleged food-borne illness (*Id.* at 10525-27).  In addition to being inconsistent with the medical records, the two letters that petitioner relies on to support this claim are also inconsistent with these other letters that Dr. Ehresmann drafted while treating petitioner.  The other letters generally describe petitioner's medical history in a manner more closely resembling what appears in her contemporaneous medical records and none of them include any reference to

reactive polyarthritis, though one 2018 letter references severe and progressive post-vaccination symptoms without identifying any diagnosis. (Ex. 9, pp. 38753-55.)

This is not necessarily to suggest Dr. Ehresmann has acted improperly; however, the inconsistency among the letters highlights the fact that the advocacy context evidenced by these letters involves a different set of motivations in general and does not warrant the same presumption of accuracy as when proper treatment hangs in the balance. *Curcuras*, 993 F.2d at 1528 (noting with respect to medical records that "[w]ith proper treatment hanging in the balance, accuracy has an extra premium."). For example, in the letter that Dr. Ehresmann drafted for petitioner for purposes of asserting an insurance claim relative to a food-borne illness, he opined as to the cause of what he described as severe gastroenteritis while acknowledging in the same letter that he did not examine or treat petitioner for the gastroenteritis, nor did any other physician. (Ex. 9, pp. 10525-26 (noting that petitioner "was actually not even able to get in for outpatient evaluation and treatments to confirm the nature of her gastrointestinal condition").) An important and related point is that the record evidence further suggests that these letters generally were not written by Dr. Ehresmann independently. (*See* Ex. 9, pp. 22930 (petitioner calling "to inquire about the letter that you are going to speak to her about."), 24125-26 (petitioner "eagerly asking" about letter and noting repeated requests for it), 38726 (requesting a letter and asking that it state specific factual representations), 23714 ("asking if the letter is ready to be read to her").)

Additionally, only Dr. Ehresmann's February 2016 letter, which is far less detailed regarding the basis for Dr. Ehresmann's opinion, and not his July 2020 letter, is contemporaneous to the period of alleged onset.[7]  Moreover, the characterization of petitioner's condition and numerous specific observations in Dr. Ehresmann's July 2020 letter also differ significantly from his own prior assessments as contained in his treatment records and prior letters without any explanation for the resulting change of view.  For example:

- In his 2020 letter, Dr. Ehresmann states that petitioner had only "very modest" pre-existing degenerative changes in her joints with "minimal" changes seen radiographically. (Ex. 8, p. 2-4.)  However, in his February 2016 letter to Gallant Medical Supply he characterized petitioner's pre-existing osteoarthritis as "significant." (Ex. 9, p. 27199.)  Additionally, his

---

[7] The Court of Federal Claims has held that:

> To be contemporaneous, the declaration need not be at the exact same time, but must be so proximate in point of time as to grow out of, elucidate, and explain the character and quality of the main fact, and must be so closely connected with it as to virtually constitute but one entire transaction, and to receive support and credit from the principal act sought to be thus elucidated and explained.

*Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 523, 539 n.10 (2011) (quoting *Bessierre v. Alabama City, G & A Ry. Co.*, 179 Ala. 317, 60 So. 82 (Ala.1912)).  In this case, as discussed further below, petitioner's affidavit describes symptoms manifesting and spreading between mid-November 2015 and May of 2016. (Ex. 1.)

earlier medical records specifically note that petitioner's joint pain was severe enough to be contributing to a limitation in her ability to ambulate as early as 2008. (Ex. 9, p. 1669.)  Dr. Ehresmann's February 2016 letter to Gallant Medical Supply also urged that petitioner had longstanding limitations in functional activity related, *inter alia*, to diffuse joint pain, osteoarthritis, and a traumatic fall two years prior. (*Id*. at 27199-200.)

- Dr. Ehresmann has also been inconsistent in discussing whether petitioner's arthritis has an inflammatory component.  In his 2020 letter, Dr. Ehresmann indicates that petitioner "has been enduring many difficult issues related to her Bechet's illness, for years before the vaccination, but did not have the symptoms of joint pain of an inflammatory nature . . ." (Ex. 8, p. 4.)  However, in October of 2008, years before the vaccination at issue, Dr. Ehresmann prescribed Plaquenil to petitioner "in an effort to control her joint symptoms which are likely to a degree inflammatory." (Ex. 9, p. 1669.)  Conversely, Dr. Ehresmann's July 2020 letter cites an MRI of February *2017* as evidence supporting his conclusion that petitioner's post-vaccination arthritis is inflammatory rather than degenerative (Ex. 8, p. 3); however, he recorded in January of *2018*, following his own physical examination, that petitioner had no inflammatory arthritis in her extremities (Ex. 9, pp. 35780-81).

- In 2020, Dr. Ehresmann cites petitioner's ankles as being "particularly symptomatic" and an example of her persistent joint pain in multiple joints representative of her reactive polyarthritis. (Ex. 8, p. 3.)  However, at his prior July 6, 2016 follow up encounter he diagnosed petitioner only with a localized ankle condition ("other specified disorders of the ankle and foot joint" along with "ganglion of the tendon sheath") (Ex. 9, p. 30691).  Although his 2020 letter describes the results of petitioner's February 2017 MRI (*compare* Ex. 8, p. 3 and Ex. 9, p. 30635), by the time of this July 2016 encounter, petitioner's alleged reactive polyarthritis would have been fully manifested based on the onset of symptoms described in her affidavit (Ex. 1).

- Dr. Ehresmann also writes that petitioner's joint pain was "far out of proportion to any radiographic changes associated with what has been described as mild osteoarthritis." (Ex. 8, p. 2.)  Yet petitioner's medical records rarely document any reports of worsening pain following her vaccination.  Instead, her records show that she consistently reported chronic and migrating pain associated with her history of gout, osteoarthritis, right foot ganglion cyst, and, on one occasion, chest pain. (*See e.g.* Ex. 9, pp. 26699, 27188-89, 29065, 29311-29313, 31106-08, 30691.)  In fact, petitioner's earliest reported worsening of pain contained in her medical records was on July 17, 2017 where she reported worsening knee and ankle pain.  (*Id*. at 32729, 32025.)  Contrary to what is stated in his 2020 letter, in July of 2017 Dr. Ehresmann did correlate

petitioner's report of increased pain to her osteoarthritis, recording upon Review of Systems "[i]ncreasing pain left knee and both ankles where she has radiographic OA changes." (*Id*. at 32729; *see also* 32723 (Dr. Chen noting Dr. Ehresmann had recently seen petitioner for "worsening pain due to OA.")

Accordingly, for all the reasons discussed above, Dr. Ehresmann's letters lack the same indicia of credibility and reliability typical of contemporaneous medical records.  Upon my review of the complete record, where Dr. Ehresmann's letter conflicts with petitioner's contemporaneous medical treatment records, petitioner's medical records should be given greater weight.[8]

### b.  Symptom onset

Petitioner avers that about a week and a half after having her stiches removed, she began to suffer headaches and left arm pain.  (Ex. 1, p. 2.)  Petitioner had her stiches removed on November 3, 2015, which places onset of these symptoms in mid-November, between about 20-30 days after her October 22, 2015 Tdap vaccination.  Petitioner also avers that at this point she told her doctor she was suffering "much higher level of pain from my toes to my brain."  (Ex. 1, p. 2.)  Petitioner also indicates, without specifying onset, that she suffered muscle spasms, a stiff neck, and right shoulder pain followed by left shoulder pain, and nerve pain all over her body.  (*Id*.)  Petitioner avers that she began experiencing "bone crunching" in her elbows in February of 2016 that spread to her whole body in May of 2016.  (*Id*.)

In her affidavit, petitioner also indicates that when she first reported her symptoms to her doctor (unnamed), the doctor indicated that it may be due to her weaning off of narcotics.  (Ex. 1, p. 2.)  In her affidavit, petitioner explained that prior to vaccination she had one type of pain medication she used generally and a second that she used for breakthrough pain.  (*Id*.)  However, she represented that prior to vaccination she was "nearly completely off" of her pain medication and it was not until

---

[8] Petitioner stresses that "the Court and the parties discussed the need for Dr. Ehresmann to assist the Court on certain issues, and Dr. Ehresmann took the time to draft a thorough letter in response to these queries.  It is misplaced for Respondent to now turn around and criticize Dr. Ehresmann for his willingness to participate in this litigation at the parties' request." (ECF No. 41, p. 2.)  There is no doubt that Dr. Ehresmann's participation in this case was voluntary and involved some burden.  I also assume that Dr. Ehresmann's advocacy for his patient is well meaning.  However, in this program treating physician opinions are not viewed as sacrosanct.  *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed.Cl. 706, 746 n.67 (2009) ("there is nothing ... that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").  Rather, when considering medical opinion evidence special masters are required to determine whether it has a reliable basis.  *Moberly v. Sec'y of Health & Human Servs.,* 592 F.3d 1315, 1326 (Fed. Cir. 2010)("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence.")  Nonetheless, I stress that the instant analysis is limited to determining as a legal matter how Dr. Ehresmann's letters should be weighed as compared to the contemporaneous medical records within the context of this claim.  Nothing in this decision is intended to critique the standard of care petitioner actually received from Dr. Ehresmann relative to the conditions reflected in the medical records.

after she started experiencing post-vaccination muscle spasms that she resumed narcotic medication.  (*Id*.)  However, her medical records reflect that as of November 10, 2015, a date falling after her vaccination but prior to the above-described mid-November symptom onset, she was seeking to have her methadone[9] prescription refilled at a 60mg dose, which was noted to be higher than the 50mg dose she had been taking during the summer.  (Ex. 9, p. 24539.)  Her medical records also reflect as of June of *2014* that she had begun taking methadone in an effort to taper off of short-acting opiates.  At that time her methadone dose was 40-50mg and she had an additional prescription for 20mg of oxycodone for breakthrough pain.  (Ex. 9, pp. 24111-12.)  Dr. Ehresmann later referenced petitioner as "trying to gradually taper" her opioid treatment in his April 12, 2016 cardiology referral without specifying the timeframe.  (*Id*. at 27198.)  However, he characterized her as still being on "substantial amounts of opioids on a regular basis."  (*Id*.)  Accordingly, petitioner's affidavit does not appear to be entirely consistent in her recollection of the circumstances surrounding the initial onset of her symptoms as the medical records do not support her suggestion she was "nearly completely off" of her pain medication around the time of her vaccination.

The most contemporaneous document discussing these alleged symptoms is the February 3, 2016 letter by Dr. Ehresmann to Gallant Medical Supply advocating for a power wheelchair for petitioner.  (Ex. 9, pp. 27199-201.)  In that letter, Dr. Ehresmann confirms that he had a face-to-face evaluation with petitioner as of that date and describes petitioner as suffering a serious medical illness of Bechet's syndrome, which includes systemic illness and diffuse joint pain.  (*Id*. at 27199.)  He also notes petitioner to have significant osteoarthritis of the lower extremities, but notes that "[a]dditionally, she has upper extremity symptoms with epicondylitis and joint pain, much of which exacerbated following a tetanus immunization a few months ago which resulted in reactive polyarthritis."  (*Id*. at 27199-200.)  This is the full extent of Dr. Ehresmann's contemporaneous reference to any symptoms related to reactive polyarthritis.[10]

Dr. Ehresmann's much later letter of July 14, 2020, further indicates that petitioner suffered pain in the shoulders, joint pain generally, enthesitis, and neuropathic symptoms, but was no more specific regarding onset than to state that these symptoms

---

[9] Methadone is a synthetic opioid used in the treatment of heroine addiction, but is also used as a narcotic pain medication similar to morphine.  *Dorland's Illustrated Medical Dictionary*, 33rd Ed. (2020), p. 1130.

[10] However, Dr. Ehresmann drafted a cardiology referral on April 12, 2016, that discussed petitioner's overall condition as "a long history of Bechet's syndrome, with may cutaneous lesions superimposed on other problems which include prior obesity and gastric bypass with associated problems."  (Ex. 9, pp. 27197-98.)  He noted that "[c]hronic pain is a significant issue, with the patient requiring substantial amounts of opioid on a regular basis," but offered no discussion of any recent exacerbation or of the specific symptoms discussed above.  (*Id*. at 27198.)   On May 3, 2016, he wrote a letter on petitioner's behalf indicating that she suffered "other complicating intervening illness in the last 2 years," but only specifically mentioned a traumatic fall occurring two years prior and no discussion of the above-discussed symptoms.  (*Id*. at 27610-11.)  On June 29, 2016, Dr. Ehresmann ordered then cancelled an EMG study due to pain in the upper extremities attributed to necrotizing vasculitis.  (*Id*. at 47.)  On July 6, 2016, Dr. Ehresmann saw petitioner for right ankle pain due to a ganglion cyst.  (*Id*. at 30690.)

presented post-vaccination.[11]  (Ex. 8.)  Moreover, apart from shoulder pain, these symptoms are not referenced in Dr. Ehresmann's February 3, 2016 letter.  (Ex. 9, pp. 27199-201.) This weighs against any conclusion that these other symptoms presented at the same time as the upper extremity joint pain referenced in the February 3, 2016 letter. The earliest objective finding he cites with respect to any of these symptoms is a hip x-ray of March 2016.  That study is cited as failing to provide satisfactory radiographic evidence to explain petitioner's "exquisite" hip pain.  (Ex. 8, p. 2.)  However, the contemporaneous February 3, 2016 letter, written just one month prior to the March 2016 hip x-ray, attributes petitioner's increasing hip pain to a traumatic fall she experienced two years prior, suggesting that the onset of increasing hip pain was not associated with the post-vaccination period.  (Ex. 9, p. 27200.)

In her motion, petitioner discusses several additional records from the months following vaccination that she suggests corroborate her account.  Specifically, she notes that she presented for x-rays of her knees and pelvis on March 7, 2016, at which point she was noted to have leg pain with walking and joint stiffness, tingling, and muscle aches and pains.  (ECF No. 37, p. 6 (citing Ex. 9, pp. 26262, 26699).)  Petitioner also had an April 12, 2016, cardiology appointment that discussed her chronic pain as a significant issue.  (*Id*. (citing Ex. 9, p. 27198).)  Petitioner had an MRI of her back on April 13, 2016, and a further appointment at which her chief complaint was chronic pain syndrome.  (*Id*. (citing Ex. 9, pp. 31479, 31106).)  However, all of these records relate to complaints that can be attributed to petitioner's preexisting conditions and generally reference her chronic condition without reference to any recent exacerbation.  In fact, petitioner's records document multiple visits to several different doctors during the course of her treatment in the months and years following her vaccination.  Based on these records, it appears that petitioner did not specifically report increasing pain until July 17, 2017, nearly two years after her vaccination.  (Ex. 9, p. 32729.)  Around this same time, petitioner began reporting that she had experienced a reaction to her Tdap vaccine.  (*Id*. at 32687, 35219.)  However, she did not report the specific symptoms described in her affidavit as occurring during the weeks following her vaccination.  (*See* Ex. 9, pp. 26262, 31106-08, 30690-92, 29311-14, 29065.)

Petitioner relies primarily on her own affidavit to support her specific account of onset and cites the Federal Circuit's decision in *James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374 (Fed. Cir. 2021) to suggest that her affidavit should receive deference over other forms of evidence, including her contemporaneous

---

[11] The fact that Dr. Ehresmann identifies these complaints as symptoms of reactive polyarthritis is not helpful in resolving the timing of onset.  As a rheumatologist, Dr. Ehresmann likely has some understanding of the time-course necessary for these subsequent symptoms to be attributed to the reactive polyarthritis; however, this is not discussed in his letter and, for all the reasons discussed in the preceding section, this letter does not have the credibility and reliability necessary to presume Dr. Ehresmann's association of these symptoms to reactive polyarthritis is accurate.  In any event, relying on Dr. Ehresmann's medical training and/or role as a treating physician to infer facts not stated in his letter would be speculative.  Notably, a prior 2018 letter to the California Department of Health Care Services similarly indicates without specificity that petitioner "developed a severe set of symptoms following immunization for tetanus about 2 years ago and has had progressive joint pain and other complicating symptoms since that time," but refrains from attributing petitioner's post-vaccination course to reactive arthritis. (Ex. 9, p. 38754.)

Case 1:18-vv-01463-UNJ   Document 44   Filed 12/03/21   Page 24 of 26

medical records. However, this is not the holding of *James-Cornelius*. In *James-Cornelius*, the Federal Circuit held, in the context of assessing whether a petition had a reasonable basis as a condition to an award of attorneys' fees and costs, that a petitioner's statement "may be the best, or only, direct evidence" of timing and severity of their symptoms. *Id*. at 1380. This does not mean that a petitioner's account will necessarily warrant extensive weight or deserve deference simply by being a statement of the petitioner regarding onset. In fact, the Federal Circuit specifically noted that contemporaneous medical records "may indeed serve as important corroborating evidence for evaluating testimony's credibility . . . ." *Id*. Ultimately, *James-Cornelius* simply requires a special master to consider petitioner affidavits when evaluating whether a reasonable basis exists for a petitioner's claim. *James-Cornelius* did not disturb the longstanding understanding in this program regarding the balancing of contemporaneous medical records against later submitted testimonial evidence as discussed in the preceding section.[12]

Here, Dr. Ehresmann's February 3, 2016 letter to Gallant Medical Supply constitutes contemporaneous documentation (albeit not in medical record form) corroborating petitioner's complaint of an exacerbation of symptoms subsequent to her Tdap vaccination. Importantly, however, that letter only evidences that petitioner suffered a subjective complaint of increased upper extremity pain beginning sometime prior to February 3, 2016. Dr. Ehresmann's subsequent July 14, 2020 letter, though it indicates the fact of additional symptoms purportedly related to reactive polyarthritis, is inadequate to corroborate the alleged onset of such symptoms. Otherwise, petitioner's contemporaneous medical records do not accord with her account and petitioner provides no explanation for this discordance. Those citations to the medical records that petitioner does provide from the months following her vaccination do not distinguish her complaints from her prior chronic condition, a point that is underscored by Dr. Ehresmann's February 3, 2016, which attributes ongoing systemic illness and diffuse joint pain to petitioner's preexisting Bechet's disease and osteoarthritis. Accordingly, the evidence preponderates only in favor of a finding that petitioner suffered a subjective increase in upper extremity joint pain following her Tdap vaccination no earlier than mid-November 2015 and no later than February 3, 2016. The record is inadequate to place onset of any other alleged symptom within that period.

### c. Diagnosis

The Federal Circuit has held that contemporaneous records deserve greater weight than other forms of evidence so long as they are clear, consistent, and complete. *Curcuras*, 993 F.2d at 1528; *see also Lowrie*, 2005 WL 6117475 at *20. In this case, petitioner's medical records are very clear and very consistent in not ever recording reactive polyarthritis as a diagnosis explaining petitioner's medical history. Accordingly, petitioner's medical records weigh against acceptance of the diagnosis of reactive polyarthritis. Moreover, as explained above, Dr. Ehresmann's letters to the contrary do not outweigh the medical records because they were not written in the context of

---

[12] *I.e. Cucuras, Lowrie, Kirby, Murphy, Milik, Camery, Burns, LaLonde, supra.*

diagnosis and treatment and numerous specific assertions in Dr. Ehresmann's letters are inconsistent with his own prior assessments.  *Doe v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law."). Nonetheless, petitioner is permitted under the terms of the Vaccine Act to demonstrate her claim by either medical record or medical opinion. § 13(a).  Thus, the fact that Dr. Ehresmann's ultimate diagnosis of reactive polyarthritis is not in itself supported by contemporaneous medical record entries is not necessarily dispositive of whether petitioner could be diagnosed with reactive polyarthritis.

However, Dr. Ehresmann's ultimate diagnostic opinion as contained in his July 2020 letter is also inherently premised on an understanding of the condition at issue – reactive polyarthritis – that remains unstated.  In fact, Dr. Ehresmann focuses primarily on ruling out other possible explanations for petitioner's symptoms and does not discuss what considerations are involved in diagnosing reactive arthritis.  Additionally, Dr. Ehresmann leans heavily on the idea that what petitioner has experienced is a five-year course of persistent, otherwise unexplained, symptoms and that "[t]he evolution of these symptoms subsequent to her vaccination are certainly consistent with post-vaccination responses."  (Ex. 8, p. 3.)  However, it has previously been observed that reactive arthritis is more likely to be a transient condition as compared to other forms of arthritis. *Hock v. Sec'y of Health & Human Servs.*, No. 17-168V, 2020 WL 6392770 (Fed. Cl. Spec. Mstr. Sept. 30, 2020).  Thus, even if Dr. Ehresmann accurately identified petitioner's initial complaint of post-vaccination upper extremity pain as reactive arthritis, it also remains unclear whether it explains her later symptoms as Dr. Ehresmann further suggests.  Dr. Ehresmann also asserts that a significant part of petitioner's post-vaccination presentation is the onset of neuropathic symptoms.  However, despite highlighting neuropathic symptoms as an important part of petitioner's overall presentation, he has not identified them as contributing to any unifying diagnosis.  Nor has he alternatively discussed why reactive polyarthritis would remain the best diagnosis if it does not encompass a substantial part of what he considers her relevant post-vaccination presentation.

Special masters are not charged with "diagnosing" petitioners.  *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994).  Moreover, special masters "must determine that the record is comprehensive and fully developed before ruling on the record."  *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *see also* Vaccine Rule 8(d); Vaccine Rule 3(b)(2).  Accordingly, given that I have found that there was some change in petitioner's presentation post-vaccination, petitioner shall have an opportunity to supplement the record with an expert opinion addressing whether petitioner's history is consistent with a diagnosis of reactive polyarthritis as stated by Dr. Ehresmann. Petitioner's expert opinion shall rely on the facts as found in section V(b) above.  Additionally, in light of the analysis contained in section V(a), petitioner's expert should be careful to distinguish between facts derived from petitioner's medical records and facts derived from Dr. Ehresmann's letters. "When an expert assumes facts that are not supported by a preponderance of the evidence, a

finder of fact may properly reject the expert's opinion." *Dobrydnev v. Sec'y of Health & Human Servs.*, 566 Fed. Appx. 976, 982-83 (Fed. Cir. 2014) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

## VI.    Conclusion

For the above reasons I find on the current record that there is preponderant evidence that petitioner suffered a subjective increase in pre-existing upper extremity joint pain no earlier than mid-November 2015 and no later than February 3, 2016. There is not preponderant evidence that any other alleged symptom of reactive polyarthritis began within that period.  Additional expert evidence will be necessary to determine whether this finding of fact supports the diagnosis of reactive polyarthritis stated by Dr. Ehresmann.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master